WOODS (HYDE v.). See Case No. 6,975.

---

## Case No. 17,993.

### WOODS v. JACKSON IRON MANUF'G CO.

[Holmes, 379.] [1]

Circuit Court, D. New Hampshire. May 1, 1874.

STATUTE—REPEAL BY IMPLICATION—CONVEYANCE OF STATE LANDS—RECORD.

1. The provisions of a statute, so far as they are inconsistent with those of a subsequent statute relating to the same subject-matter, are by implication, if not expressly, repealed by the later statute.

2. Under the resolve of the legislature of New Hampshire. approved June 22, 1831, conveyances of state lands by a land commissioner may be recorded in the office of the secretary of state at any time, and take effect only on being so recorded.

At law.

Gilman Marston, A. A. Strout, and R. D. Smith, for plaintiff.

M. W. Tappan. William Heywood, and Henry Heywood, for defendant.

SHEPLEY, Circuit Judge. This is a real action, brought for the recovery of a tract of land containing eleven hundred acres, situate in Bartlett, in the county of Carroll, and state of New Hampshire. A stipulation is filed that the case shall be heard and tried by the court without the intervention of a jury, saving to either party the right of exceptions, writ of error, or appeal, according to law.

Both parties claim title under grant from the state of New Hampshire. It is admitted that the title was in the state of New Hampshire prior to July 2, 1835. The following act of the legislature of New Hampshire was approved June 25, 1830:

"An act providing for the recording of deeds of state lands in the office of the secretary of state.

"Section 1. Be it enacted by the senate and house of representatives in general court convened, that all deeds of land belonging to the state, which may hereafter be executed and delivered, by any officer or agent of the state authorized to make such conveyance, shall be recorded in the records of the state by the secretary; and no deed of conveyance, or lease of any lands, or of title or claim to any lands, in this state, shall be of any force or effect for the conveyance of the same, or for the release of any title or claim of the state, unless the same shall have been recorded, as aforesaid, within one year from the date of the same."

The following resolve of the legislature was approved June 22, 1831 (chapter 51): "Resolved, by the senate and house of representatives in general court convened, that his excellency the governor, by and with advice and consent of the council, be, and he hereby is, authorized and empowered to appoint some suitable person or persons, not exceeding two, as land commissioners, who shall be sworn to the faithful performance of the duties of their trust, and to continue in office during the pleasure of the executive for the time being, whose duty it shall be to advertise and expose to sale such public lands as he or they may think proper, for the interest of the state; and, upon application made to any such commissioner by any person or persons for the purchase of any lands belonging to this state lying south of the forty-fifth degree of north latitude, to sell and convey to such person or persons any such lands for such consideration as to such commissioner or commissioners the interest of the state may seem to require; and to execute deeds thereof, which deeds, being first recorded in the office of the secretary of state, shall be effectual for conveying all the right and title of this state to such land, saving the right of jurisdiction: provided, that all the expenses of surveying and conveying any such lands shall be paid by the person or persons to whom such lands shall be conveyed; and said commissioner or commissioners shall receive from the amount of all sums of money arising from such sales, and which sums he or they shall pay to the

---

[1] [Reported by Jabez S. Holmes, Esq., and here reprinted by permission.]

treasurer of this state, the amount of six per cent. in full compensation for his or their services. And be it further resolved, that it shall be the duty of each and every such commissioner so appointed to deposit all moneys by him received for such lands with the treasurer of this state as soon as may be after receiving the same, and shall annually in the month of June make report to the governor of this state of all lands conveyed and sold by him aforesaid, including the quantity and value thereof, where the same lies, and such other information as he may deem expedient."

At a meeting of the governor and council on the first day of July, 1831, James Willey, of Conway, was appointed land commissioner, and he was duly commissioned and qualified. On the third day of July, 1835, in consideration of $300 paid by Daniel Eastman, of Conway, "James Willey, of Conway, in the county of Strafford, and state of New Hampshire, land commissioner, remised, released, and forever quitclaimed unto said Daniel Eastman, and his heirs and assigns forever, all the right, title, claim, and interest which said state now has in and unto the following described tract of public land, viz." (Here followed a description of the demanded premises by metes and bounds.) After the usual habendum clause, and a special covenant of warranty against "persons claiming by, from, or under me in my official capacity as land commissioner aforesaid," the deed concludes as follows: "In witness whereof I have hereunto set my hand and seal this third day of July, in the year of our Lord one thousand eight hundred and thirty-five. James Willey (Seal), Land Commissioner."

The deed was duly witnessed and acknowledged. The consideration was paid by the grantee to Willey, and by him paid over to the state of New Hampshire. This deed was not recorded in the office of the secretary of state for New Hampshire until June 28, 1837, nearly two years from and after date of the same. It was recorded in the registry of deeds for Coos county on the eighth day of July, 1835.

By sundry mesne conveyances through Jeremiah Eastman to Trickey and Meserve, and from them to one Odiorne, and from him to the Jackson Iron Manufacturing Company, whatever title Daniel Eastman had in the premises passed to the defendant on the twenty-sixth day of June, 1837.

The demanded premises have been taxed in the town of Bartlett to the grantees in the deeds under Daniel Eastman from 1836 to the present time, and from 1844 to the present time to the Jackson Manufacturing Company; and the defendant proved the payment of these taxes.

The tract is a mountain; some portion of it on the south side, where cattle can pasture; the rest is wild-land. Meserve and Trickey took a bond of the land Oct. 5, 1835, from Daniel Eastman, made a partial survey, and ascertained that iron ore was on the tract, and took out about one hundred pounds of the ore, which they took to Franconia and had tested. They then took their deeds of Eastman, and in March, 1836, surveyed the tract with compass and chain, and erected monuments. In May, 1837, Dr. Jackson went on to the tract with Odiorne, one of the grantees, and explored it. In June, 1838, Meserve and Odiorne and others employed twelve men on the tract in uncovering another and different vein of the ore, and took out about a ton of the ore, which they sent to Dover to be tested. In 1842 Meserve and others went on to the tract with a Mr. Lang, of Boston, and Sanderson, of Sheffield, England. In the succeeding autumn they took out a ton of the ore, which was forwarded to Sheffield, England. In 1844 Mr. Parrott, of Boston, an engineer in the employment of the defendant corporation, surveyed a road leading through the woods up the side of the mountain about two miles, and extending about one hundred rods on to this tract, which road was built about that time. Mr. Meserve was the agent for the defendant corporation, and went on to the tract every year after the conveyance to the Eastmans three or four times a year, sometimes oftener. In 1847 he went on with Mr. Coe, who went on to examine as agent of the defendant; also in 1848, with Pingree and Cowes, who were interested in the corporation. Ore was also taken from the tract in 1870 by him.

There has never been any adverse possession or exercise of any acts of ownership on the tract by any other persons than those claiming under the title under which defendant claims.

Plaintiff read from the Public Laws of the state of New Hampshire:

"Chapter XLII., joint resolution in relation to the public lands.

"Section 1. Governor authorized to sell lands: proceeds to be added to literary fund.

"Resolved, by the senate and house of representatives in general court convened:

"Section 1. That his excellency the governor be requested to investigate the condition of all the public lands belonging to the state, and that he is hereby authorized and empowered, with the advice of the council, to sell and dispose of the same, together or in parcels, as may be by him deemed most advantageous to the state; the proceeds of such sale or sales to be placed in the state treasury, and constitute a part of the literary fund, to be divided among the several cities and towns, and by them applied to the maintenance of common schools, or to other purposes of education as now provided by law, and that the treasurer be empowered to make and execute conveyances thereof, in accordance with the contracts of sale entered into

by the governor." Approved June 28, 1867.

Plaintiff also introduced in evidence the records of a meeting of the governor and council of the state of New Hampshire, held Oct. 15, 1867, in which record was the following entry:

"Sold all the public lands in Grafton, Carroll, and Coos counties, for the sum of $25,000, to Aurin M. Chase, of Whitefield."

Peter Sanborn was the treasurer of the state of New Hampshire for the year 1867, duly elected, qualified, and sworn. The plaintiff then offered in evidence, subject to the objection duly made by defendant, a deed acknowledged Oct. 21, 1867, from Peter Sanborn, treasurer, to Noah Woods, the plaintiff, and William H. Smith, quitclaiming and releasing to Woods and Smith, their heirs and assigns forever, "all and singular the lands belonging to the state of New Hampshire, or in which the said state of New Hampshire has or might have any right, title, interest, or claim in any way whatever, situate and lying within the limits of the counties of Grafton, Carroll, and Coos, in said state of New Hampshire, however located and bounded, estimated one hundred thousand acres, more or less, meaning and intending hereby to assign and convey to said Woods and Smith, their heirs and assigns forever, all and singular the land in said counties of Grafton, Carroll, and Coos, to which the said state of New Hampshire has or might have any claim or title in any way whatever, excepting and reserving from said grant the arsenal lot in Lancaster, in the county of Coos, and any gun-house lot owned by the state in said counties of Grafton, Carroll, and Coos aforesaid."

This deed was duly recorded in the office of the secretary of state Nov. 21, 1867. It appeared in evidence that this deed was made by direction of the governor, and at the request of Aurin M. Chase, to Woods and Smith; and that the sum of $25,000 was paid to the governor, and by him to the treasurer of state, and by him carried to the credit of the literary fund. The sum of $25,000 was the consideration of this and other conveyances, made at the same time to Aurin M. Chase, and to others under his direction and by his request.

By subsequent conveyances, Noah Woods obtained the interest of William H. Smith in the demanded premises.

The principal objection made by the plaintiff to the title of the tenant is, that the deed of Willey, the land commissioner, to Eastman, was not recorded in the records of the state, by the secretary of state, within one year from the date of the deed, in accordance with the provisions of the act of June 25, 1830, and therefore the plaintiff contends that the deed was for this reason absolutely null and void, and without force and effect. The act of June 22, 1831, under which Willey was appointed land commissioner, and by authority of which he sold the land and made the conveyance to Eastman, authorized him "to execute deeds thereof, which deeds, being first recorded in the office of the secretary of state,

shall be effectual for conveying all the right and title of this state to such land, saving the right of jurisdiction." This deed was recorded, as we have seen, within two years of its date, and more than thirty years before the date of the deed under which plaintiff claims; and the state of New Hampshire retained in its treasury during all this time the consideration paid for the land, and the grantees exercised during all that period a possession as open, notorious, and exclusive, as is ordinarily exercised over lands of that description, in what was then a wild and uninhabited mountainous region. This possession, occupancy, and claim of title was well known to Aurin M. Chase, as he himself states; and from the evidence in the case there can be no reasonable doubt that the parties who took the deeds as his appointees had full notice of all the facts. Yet it is claimed by the plaintiff that the condition in the act of 1830 was a condition precedent; and, not having been complied with, the deed was null and void, and no entry was necessary by the state to reinvest the title. The cases of Greenleaf's Lessee v. Birth, 6 Pet. [31 U. S.] 302, Robinson v. Minor, 10 How. [51 U. S.] 641, and Easton v. Salisbury, 21 How. [62 U. S.] 426, would seem to support this view, if the act of 1830 is to be considered as applicable to the case. To the same effect is the opinion of the court in the learned opinion in Hill v. Dyer, 3 Greenl. 441, and of the supreme court of New Hampshire in Stone v. Ashley, 13 N. H. 38. But the true answer to this position is, that the act of 1830 did not apply to this conveyance. The act of 1831 was a distinct and independent piece of legislation. It furnished of itself a complete mode by which the conveyances of state lands sold under its provisions could be made. The provisions of that act are inconsistent with and repugnant to the act of 1830, and, so far as inconsistent with and repugnant to those provisions of the act of 1830, it repeals them. The deed to Willey was executed, delivered, and recorded in strict compliance with the act of 1831.

The grantee, in a deed executed under the provisions of the act of 1831, was notified, by the terms of the act under which he claimed title, that his deed was effectual only "when first recorded in the office of the secretary of state." Until that record was made, he had no title and no seisin. When recorded, the deed became operative. The plaintiff contends that the effect of the statute is as if it read, "when first recorded as provided in the act of June 25, 1830." It is not enough for his purpose to read, "when first recorded according to law," for the general law made deeds operative between the parties and persons having actual notice of them without record, and as to other parties after record. The rule in the act of 1830 was a special one, applicable to conveyances from the state alone. It required them to be recorded "in the records of the state by the secretary," and allowed one year's time from the date of the

deed within which to make the record. The grantee under that statute paid his consideration, and took a valid, effectual, and operative deed, not requiring for its validity to "be first recorded," but one which ceased to be "of any force or effect, for the release of any title or claim of the state, unless the same shall have been recorded as aforesaid within one year from the date of the same." The difference in the phraseology used in the two acts with reference to the record shows also the intention of the legislature to make the provision in the act of 1831 complete in itself, without reference to the act of 1830.

The act of 1830 required the conveyance to "be recorded in the records of the state by the secretary." The act of 1831 provided, "which deeds, being first recorded in the office of the secretary of state, shall be effectual for conveying all the right and title of the state," &c. It is well settled, that where the subject of a former statute is embraced in the provisions of a later statute, if the later statute appears to be intended to prescribe the only rules which should govern that subject, the particulars of the old law in which they differ will be regarded as repealed by implication; but the old law is repealed by implication only pro tanto to the extent of the repugnancy. Dexter & L. Plank-Road Co. v. Allen, 16 Barb. 18; Goddard v. Boston, 20 Pick. 410; Daviess v. Fairbairn, 3 How. [44 U. S.] 636; State v. Wilson, 43 N. H. 419; U. S. v. Tynen, 11 Wall. [78 U. S.] 92; New London R. Co. v. Boston & A. R. Co., 102 Mass. 389. The condition in the act of 1831 was fully complied with when the deed to Eastman was recorded, June 28, 1837. After that time the deed was "effectual for conveying all the right and title of the state." The view we have taken of the construction of the act of 1831 establishes the title of Eastman and the tenants claiming under him, and renders it unnecessary to decide whether the act of June 28, 1867, which authorized the governor to sell and dispose of the public lands belonging to the state, would authorize the sale of lands which the state had once conveyed by deed, and for which the state had received full consideration, and where the seisin of the tenants for thirty years and more had been under a delivery of seisin by the agent of the state, it is not a wrongful intrusion on the public lands.

The defendant did not disseise the plaintiff, and there must be judgment for defendant, with costs.